STATE OF INDIANA         )
                   ) SS:  IN VANDERBURGH SUPERIOR COURT
COUNTY OF VANDERBURGH  )

| | |
|---|---|
| JOSEPH L. REXING JR. and ) | |
| LEO R. REXING ) | |
| ) | |
| Plaintiffs, ) | |
| ) | 82D05-2111-PL-005724 |
| v. ) | |
| ) | |
| GOODMAN NETWORKS ) | |
| INCORPORATED d/b/a ) | |
| GOODMAN SOLUTIONS ) | |
| ) | |
| Defendant. ) | |

## **COMPLAINT**

Comes now the Plaintiffs, Joseph L. Rexing, Jr. and Leo R. Rexing, by counsel, Kahn, Dees, Donovan and Kahn, LLP, and for their Complaint against the Defendant, Goodman Networks Incorporated, allege and state as follows:

### **Parties and Venue**

1.    Plaintiffs, Joseph L. Rexing and Leo R. Rexing (collectively "Rexing" or "Landlord"), are individuals and residents of Vanderburgh County, Indiana.

2.    Defendant, Goodman Networks Incorporated d/b/a Goodman Solutions ("Goodman" or "Tenant"), is an active Texas corporation with its principal place of business located at 2801 Network Blvd. Suite 300, Frisco, Texas 75034, and may be served through its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.



3.      This Court has jurisdiction over the parties and the subject matter of this litigation pursuant to Trial Rules 4(A) and 4.4, and venue for this cause of action is proper in this Court pursuant to Trial Rule 75(A) of the Indiana Rules of Trial Procedure.

### Breach of Contract

4.      Goodman received its Certificate of Authority to conduct business in the State of Indiana on July 1, 2005.

5.      On or about May 2, 2017, Rexing and Goodman entered into a Lease whereby Rexing was to lease the real estate located at 9631 Hedden Road, Evansville, Indiana (the "Premises") to Goodman.  A true and accurate copy of the Lease is attached hereto as Exhibit A and is made a part hereof.

6.      Pursuant to the Lease, the Monthly Installment of Base Rent was $6,875.00 for the initial term of three (3) years or thirty-six (36) months, with "two (2), three (3) year options subject to a 6% increase each term, or CPI whichever is higher."  See Exhibit A, p. 1.

7.      Pursuant to Section 5. of the Lease, "Tenant promise[d] to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent and Additional Rent on or before the first day of each calendar month commencing on the Commencement Date." See Exhibit A, p. 2.

8.      Pursuant to Section 7. of the Lease,

> [a]ny amount not paid by Tenant after its due date, in accordance with the terms of this Lease, shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or the Prime Rate (as reported in the Wall Street Journal) of interest ("Prime Rate") plus six percent (6%) per annum.

See Exhibit A, p. 3.

9.      Section 15.1. of the Lease provides that

2

the Tenant, at its expense, shall make all redecorations, repairs and replacements to the ceilings, floors, walls, doors, windows (including replacement of cracked or broken glass with like kind and quality), including, the heating, air conditioning, electrical and plumbing systems, except as otherwise set forth in this Section 15. Tenant shall have the HVAC equipment serviced by a contractor at least quarterly and provide copies of the service reports to Landlord promptly after each such service.  Provided that Tenant performs the quarterly servicing of the HVAC system as required hereunder and performs all maintenance recommended by the HVAC contractor, Landlord shall be responsible for the replacement and non-routine repair of the HVAC systems for amounts which exceeded $500.00 per occurrence.  Tenant shall remain responsible for all other repairs and routine maintenance of the HVAC system.

See Exhibit A, p. 8.

10.    Section 15.1. of the Lease also provides that

[o]n the Commencement Date, the Landlord shall deliver the HVAC system in good working order sufficient to provide heating, cooling and ventilation to the Premises in a matter consistent with the industry standard for similar industrial space in Vanderburgh County Indiana.  Any costs Landlord incurs in the delivery of the HVAC system shall not be included in additional charges to the Tenant in the form of Additional Rent.  The Tenant shall keep and maintain the lawn and landscaping in a manner exceeding, or at a minimum consistent with the balance of the Tenants in the Airport Industrial Park.  The Tenant shall keep and maintain the parking lot in the Premises and the sidewalks immediately adjoining the public entrance to the building on the Premises clean and free from snow, ice, dirt and rubbish to the reasonable satisfaction of the Landlord and the Tenant shall not place or permit any obstructions in such areas.

See Exhibit A, p. 8.

11.    Section 20. of the Lease provides that

[u]pon the expiration of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received; broom clean, ordinary wear and tear and casualty loss and condemnation covered by Section 13 and 13 expected. . . . All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without

limitation, indemnity obligations, and obligations concerning the condition and repair of the Premises.

See Exhibit A, p. 10.

12.    Pursuant to Section 22. of the Lease

[e]ach of the following events shall be an event of default ("**Event of Default**") by Tenant under this Lease:

(a)    If the Tenant shall (i) fail to pay an installment of the Rent when due and such default is not cured withing five (5) days after written notice to Tenant that the same is due . . .

See Exhibit A, p. 11.

13.    Section 23. of the Lease provides that

[u]pon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may, subject to any judicial process and notice to the extent required by law, at any time thereafter at its election terminate this Lease or Tenant's right of possession (but Tenant shall remain liable as hereinafter provided), and/or pursue any other remedies at law or in equity. . . .

If Landlord terminates this Lease, Landlord may recover from Tenant the sum of: (i) all Base Rent, Additional Rent and all other amount accrued hereunder to the date of such termination; (ii) the cost of reletting the whole or any part of the Premises, including without limitation, brokerage fees and/or leasing commissions incurred by Landlord, costs of removing and storing Tenant's or any other occupant's property, costs of repairing, altering, remodeling, or otherwise putting the Premises into condition acceptable to an new tenant or tenants; (iii) all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and (iv) the then present value of the Base Rent, Additional Rent, and other amounts payable by Tenant under this Lease as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease, less any amounts obtained by Landlord as a result of mitigation, including reletting the Premises, pursuant to Leal Requirements. Such present value shall be calculated at a discount rate equal to the 90-day U. S. Treasury bill rate at the date of such termination.

14.     On January 7, 2020, Rexing sent a letter to Goodman providing that starting July 2020, the base rent would increase by six percent (6%), per the first renewal term of the Lease, and that the new base rent would be $7,287.50.

15.     In July 2020, Goodman began making payments in the amount of $7,287.50 for rent, pursuant to the six percent (6%) increase of the first renewal term of the Lease.

16.     On October 20, 2021, Goodman sent a letter to Rexing providing that Goodman had no plans to continue the tenancy of the Premises and that Goodman would surrender the premises on or before October 31, 2021.

17.     On October 25, 2021, Rexing informed Goodman that Goodman's Lease had been renewed and that the Lease did not end until May 2023.

18.     On October 28, 2021, Goodman surrendered its registration to conduct business in the State of Indiana.

19.     On November 1, 2021, Goodman failed to pay its November 2021 rent to Rexing in violation of the Lease and vacated the Premises shortly thereafter.

20.     Goodman has also failed to maintain and/or repair the HVAC system, failed to maintain the lawn and landscaping, failed to maintain the parking lot in the Premises clean and free from rubbish, and has placed obstructions in the parking lot in violation of the Lease.

21.     On November 8, 2021, Rexing provided written notice to Goodman of Goodman's failure to timely pay the November 2021 rent pursuant to the Lease.

22.     Upon Goodman's failure to cure the unpaid November 2021 rent, and in breach of the Lease, Rexing informed Goodman that Rexing was exercising its right to terminate the Lease on November 19, 2021.

23.    As a result of Goodman's breach of the Lease, Rexing has incurred and continues to incur damages, including back rent and other amounts accrued through the Lease's termination date, costs of reletting the Premises, maintenance and/or repair costs to the Premises, clean-up of the Premises' parking lot, maintenance of the Premises' lawn and landscaping, future rent and other amounts payable under the Lease through the termination of the Lease, attorneys' fees, and court costs.

**WHEREFORE**, Plaintiffs, Joseph L. Rexing, Jr. and Leo R. Rexing, pray for judgment in their favor and against Defendant, Goodman Networks Incorporated, for an amount sufficient to compensate them for their damages, including attorney's fees and court costs, all interest allowable by law, and that the Court grant such other and further relief as is just and proper.

Respectfully submitted,

**KAHN, DEES, DONOVAN & KAHN, LLP**

*/s/ Ryan M. Schulz*
Ryan M. Schulz, #28335-49
KAHN, DEES, DONOVAN & KAHN, LLP
501 Main Street, Suite 305
Post Office Box 3646
Evansville, Indiana 47708
Telephone:  (812) 423-3183
Facsimile:   (812) 423-3841
Email: rschulz@kddk.com

*Attorneys for Plaintiffs,*
*Joseph L. Rexing, Jr. and Leo R. Rexing*

## <u>CERTIFICATE OF FILING AND CERTIFICATION OF COMPLIANCE<br>OF PLEADINGS WITH INDIANA RULES ON ACCESS TO COURT RECORDS</u>

The undersigned hereby certifies that the foregoing document complies with the requirements of the Indiana Rules on Access to Court Records.

The undersigned further certifies that on November 29, 2021, the foregoing document was electronically filed using the Indiana E-Filing System (IEFS).

*/s/ Ryan M. Schulz*
Ryan M. Schulz, #28335-49

518419

Case 3:22-cv-00001-RLY-MPB    82D05-2111-PL-005724 1/03/22    Page 8 of 27 PageID #:
Vanderburgh Superior Court 5
Filed: 11/29/2021 1:46 PM
Clerk
Vanderburgh County, Indiana
EXHIBIT A

# LEASE

THIS LEASE is made between the Landlord and the Tenant named below effective as of the date that this Lease is last executed by Landlord and Tenant.

### Basic Lease Terms

| | |
|---|---|
| **Landlord:** | Joseph L. Rexing Jr, and Leo R. Rexing |
| **Landlord's Notice Address:** | P.O. Box 23039<br>Evansville, IN 47724<br>Attn: Dylan Rexing; General Manager of Rexing<br>Tel: (812)-777-4123<br>Fax: (812)-202-4822<br>E-mail: rexingeggs@gmail.com<br><br>With a copy to:<br>4501 Hitch Peters Road<br>Evansville, IN 47711<br>Attn: Rachel Johnson<br>Tel: (812) 297-9665<br>Fax: (812) 202-4822<br>E-Mail: accounting@pfllogistic.com |
| **Tenant:** | Goodman Network, a Texas corporation |
| **Tenant's Notice Address:** | Goodman Network<br>2801 Network Blvd Ste. 300<br>Frisco, TX 75034<br>Attn: Marzell Harris<br>Tel: ( 763 ) 439  - 5970<br>E-Mail: mlharris@goodmannetworks.com |
| **Premises:** | Two and a half acres of real property containing a building with approximately 15,000.00 square feet in Lot 17 in the Airport Industrial Park, a platted subdivision in Vanderburgh County, Indiana, which is commonly known as **9631 Hedden Road, Evansville, Indiana** together with all rights, privileges, easements, appurtenances and immunities belonging to or in any way pertaining thereto. |
| **Lease Term:** | 36 months |
| **Renewal Terms:**<br>**Commencement Date:** | Two (2), Three (3) year options subject to a 6% increase each term, or CPI whichever is higher<br>See Section 1.1 |
| **Expiration Date:** | Intentionally left blank |
| **Base Rent:** | $ 5.50 / SF NNN or $ 82,500 annually for initial 3 year term |
| **Monthly Installment of Base Rent:** | $ 6875.00 per month for the initial term of three years or 36 months |
| **Security Deposit:** | $ 3,875.00  (see paragraph 8 below) |
| **Permitted Use:** | All uses consistent with the M-2 zoning classification, including, but not limited to the storage, sales, service and distribution of various electronics equipment. |

1.    Granting Clause.

  1.1.    <u>Lease of the Premises</u>.  In consideration of the obligation of Tenant to pay Rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease.  The Lease Term shall commence on the date the Landlord delivers exclusive possession of the Premises to Tenant (the "**Commencement Date**") and shall end on the date that follows the remainder of the month in which the Commencement Date occurs plus the number of full months in the Lease Term.

2.    **Triple Net Lease**.  It is the intention of the parties that this Lease shall be construed as a triple net lease (NNN) with Tenant paying all costs for utilities, property taxes, insurance, interior and exterior maintenance, trash removal, janitorial service and all other costs of operating the subject property.

3.    **Acceptance of Premise**.  Tenant may have access to the Premises prior to the Commencement Date for the purpose of installing its fixtures, equipment and furnishings, if any; provided that, Tenant shall agree to abide by all the provisions of the Lease other than with respect to payment of Rent, as hereinafter defined, upon such access.  Tenant acknowledges that it has not relied upon any statements, representations, agreements, or warranties made by Landlord or Landlord's agents, except such as are expressed in this Lease.

4.    **Use**.  The Premises shall be used only for the Permitted Use and for no other purpose without Landlord's prior written consent, which shall not be unreasonably delayed, conditioned or withheld.  Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, overload the floor or structure of the Premises or subject the Premises to use that would damage the Premises.  Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with, or endanger Landlord or any other party. Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans With Disabilities Act, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, "**Legal Requirements**").  The Premises shall not be used as a place of public accommodation under the Americans with Disabilities Act or similar state statutes or local ordinances or any regulations promulgated thereunder, all as may be amended from time to time.  Tenant shall, at its expense, make any alterations or modifications, within or outside the Premises, that are required by Legal Requirements.  Any occupation of the Premises by Tenant prior to the Commencement Date shall be subject to all obligations of Tenant under this Lease, except for the payment of Rent.

5.    **Base Rent**.  Throughout the Lease Term, Tenant shall pay Base Rent in the amount set forth above.  Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent and Additional Rent on or before the first day of each calendar month commencing on the Commencement Date.  All sums, liabilities,

obligations and other amounts which Tenant is required to pay or discharge pursuant to this Lease in addition to Base Rent, together with any interest, penalty, or other sum which may be added for late payment thereof, shall constitute additional rent hereunder (herein called **"Additional Rent"**). All payments required to be made by Tenant to Landlord hereunder shall be payable at such address as Landlord may specify from time to time by written notice delivered in accordance herewith. The obligation of Tenant to pay Base Rent and Additional Rent (sometimes hereinafter collectively referred to as **"Rent"**) and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any Rent due hereunder, except as specifically provided herein. If the Lease Term commences or expires on a date other than the first day or the last day of a calendar month, respectively, then the Rent payable for such partial calendar month shall be an amount equal to the monthly installment of Rent otherwise then in effect, divided by the number of days in the full calendar month during which the Lease Term commences or expires, respectively, and multiplied by the number of days in the partial calendar month after and including the Commencement Date or before and including the date of expiration, respectively, and provided further that the Rent for any partial calendar month at the commencement of the initial Lease Term shall be payable on the first day of the first full calendar month during the Lease Term. In the event of any failure on the part of Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided for herein (or by law or equity or otherwise) in the case of nonpayment of monthly installments of Rent.

6.    **Utilities**.    Tenant agrees to arrange for and directly pay to all Utility service providers all charges related to the Tenant's use or consumption of such Utility services on or from the Premises.

7.    **Late Charges**.    Any amount not paid by Tenant after its due date, in accordance with the terms of this Lease, shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or the Prime Rate (as reported in the Wall Street Journal) of interest (**"Prime Rate"**) plus six percent (6%) per annum. It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

8.    **Security Deposit**.    The Security Deposit shall be held by Landlord, without liability for interest, as security for the performance of Tenant's obligations under this Lease. The Security Deposit is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default. The Security Deposit shall be the property of Landlord, but shall be returned to Tenant within thirty (30) days of Tenant's satisfaction of its obligations under this Lease. Landlord shall be released from any obligation with respect to the Security Deposit upon

3

transfer of this Lease and the Premises to a person or entity assuming Landlord's obligations under this Section.

9.    **Property Improvements.**    All improvements to the property shall be done by the Tenant, at the tenant's sole expense, in accordance with the provisions of paragraph 16 below (Tenant Alterations and Trade Fixtures).

10.    **Taxes**.

10.1.    Property Taxes.    Tenant shall be liable for all taxes levied or assessed against the real property and any personal property or fixtures placed in the Premises, whether levied or assessed against Landlord or Tenant. Landlord shall provide to the Tenant a copy of the Property Tax Statement issued by the Vanderburgh County Treasurer as soon as the tax statements are mailed out each year. Tenant shall pay to the Landlord each month, simultaneously with the payment for Base Rent, an amount equal to $1/12^{th}$ of the annual property tax bill as Additional Rent.

11.    **Insurance**.

11.1.    **Landlord's Insurance**.    Landlord shall at all times during the Lease Term carry a policy of insurance which insures the Premises and all improvements located thereon, against loss or damage by fire or other casualty (namely, the perils against which insurance is afforded by a standard special risk insurance policy at full replacement cost; provided, however, that Landlord shall have no obligation to insure against, any loss of or damage to any personal property of Tenant or which Tenant may have in the building or the Premises or any Trade Fixtures (as hereinafter defined) installed by or paid for by the Tenant on the Premises or any additional improvements which Tenant may construct on the Premises. Tenant shall reimburse Landlord, as Additional Rent, for the cost of insuring the property within 15 days of receiving a copy of the Insurance Certificate and Invoice for the insurance premiums from the Landlord. If any Tenant Alterations or Trade Fixtures made by Tenant pursuant to Section 16 result in an increase in the premiums charged during the Lease Term on the casualty insurance carried by Landlord on the Building, then the cost of such increase in insurance premiums shall also be borne by Tenant, who shall reimburse Landlord for the same as Additional Rent after being separately billed therefore.

11.2.    **Tenant's Insurance**.    Tenant, in order to enable it to meet its obligation to insure against the liabilities specified in this Lease, shall at all times during the Lease Term carry, at its own expense, for the protection of Tenant, Landlord, as their interests may appear, one or more policies of general public liability and property damage insurance, issued by one or more insurance companies acceptable to Landlord, with the following minimum coverages:

(A)    Worker's Compensation - minimum statutory amount.

(B)    Commercial General Liability Insurance, including not less than one million dollars ($1,000,000), combined single limit for both bodily and property damage.

4

Tenant's insurance shall provide primary coverage to Landlord when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstance Landlord's policy will be excess over Tenant's policy. Tenant shall have the right to comply with its obligations in this Section 11.2 through adding Landlord to existing insurance policies owned by Tenant or an affiliate or parent that comply with the minimum levels of insurance hereunder.

Such insurance policy or policies shall name Landlord and Landlord's management agent as additional insureds and shall provide that they may not be canceled on less than thirty (30) days' prior written notice to Landlord. Tenant shall furnish Landlord with Certificates of Insurance evidencing such coverage. Should Tenant fail to carry such insurance and furnish Landlord with such Certificates of Insurance within thirty (30) days of Tenant's receipt of Landlord's request to do so, or if any such insurance is cancelled for any reason, Landlord shall have the right to obtain such insurance and collect the cost thereof from Tenant as Additional Rent.

Before commencing the construction of any repairs, alterations or improvements to the Premises, Tenant shall deposit with Landlord certificates of worker's compensation insurance and liability insurance of Tenant's general contractor, or if none, from each of Tenant's independent contractors prior to the commencement of any work. Such contractors' liability insurance shall be in an amount not less than $1,000,000 per occurrence, or such greater amount as Landlord may reasonably require from time to time, and shall name as additional insureds, Landlord, and Landlord's lender. The liability insurance shall be on a general commercial liability form, shall cover all hazards related to any work performed by any such contractor on the Premises, and such additional insurance coverage shall apply as primary insurance with respect to any other insurance afforded to Landlord, and Landlord's lender, and such policy will not seek contribution from any and all insurance afforded to Landlord, or Landlord's lender, whether as additional insureds or otherwise.

11.3.  **Tenant's Responsibility**. Tenant shall assume the risk of, be responsible for, have the obligation to insure against, and indemnify Landlord and hold it harmless from any and all liability for any loss of or damage or injury to any person (including death resulting therefrom) or property occurring in, or about the Premises, regardless of cause and Tenant hereby releases Landlord from any and all liability for the same, except for any loss or damage from fire or other casualty as provided in Section 11.1 and except for that caused by the sole negligence or intentional misconduct of Landlord and its employees, agents, customers and invitees. Tenant's obligation to indemnify Landlord hereunder shall include the duty to defend against any claims asserted by reason of such loss, damage or injury and to pay any judgment, settlements, costs, fees and expenses, including attorneys' fees, incurred in connection therewith.

11.4.  **Waiver of Subrogation**. Notwithstanding anything in this Lease to the contrary, Landlord and Tenant each, on behalf of themselves and their respective successors, legal representatives, assigns and insurers, hereby (i) waive any and all rights of recovery, claims, actions or causes of action against the other and their respective affiliates, officers, directors, partners, shareholders, members, agents, servants, or

5

employees for any liability or claim for injury, loss or damage that may occur with respect to this Lease, which was properly insured against under the terms of the insurance policies referred to in this <u>Section 11</u> regardless of cause or origin, including negligence of the other party hereto or its respective officers, directors, partners, shareholders, members, agents, servants, or employees, and (ii) covenants that no insurer under any insurance maintained by Landlord or Tenant, as applicable, shall hold any right of subrogation against such other party. If the respective insurer of Landlord or Tenant does not permit such a waiver without an appropriate endorsement to such party's insurance policy, then Landlord and Tenant each shall notify its insurer of the waiver set forth herein and to secure from such insurer an appropriate endorsement to its respective insurance policy with respect to such waiver at the cost of the party that procured such insurance.

12.    **Casualty**. If at any time during the Lease Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within thirty (30) days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises ("**Damage Notice**"). If the restoration time is estimated to exceed one hundred eighty (180) days, then either Landlord or Tenant may elect to terminate this Lease upon written notice to the other party given no later than thirty (30) days after Landlord's notice. If the Premises are damaged by a fire or other casualty and: (a) the damage to the Premises exceeds 50% of the replacement cost thereof (excluding foundations and footings), as estimated by Landlord; or (b) such damage occurs during the last year of the Lease Term, regardless of the extent of damage to the Premises; or (c) Landlord makes a good faith determination that restoring the Premises would be uneconomical, or (d) Landlord is required to pay any insurance proceeds arising out of such fire or casualty to Landlord's mortgagee, then Landlord, in its discretion, may terminate this Lease upon written notice to Tenant given no later than thirty (30) days after Landlord's Damage Notice. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take one hundred eighty (180) days or less (except in the event of termination by Landlord), then Landlord shall promptly restore the Premises, excluding the Tenant Alterations or Trade Fixtures and improvements paid for by Tenant whether or not installed by Landlord, subject to receipt of sufficient insurance proceeds, delays arising from the collection of insurance proceeds or from Force Majeure (as hereinafter defined) events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly reenter the Premises and commence doing business in accordance with this Lease. Rent shall abate during the period of restoration, in which case, Base Rent for the portion of the Premises rendered untenantable by the damage shall be abated on a reasonable basis from the date of damage until the completion of the repair.

If Landlord has failed to substantially complete such repair and restoration within one hundred eighty (180) days from the Damage Notice (subject to Force Majeure and Tenant-caused delays), then Tenant shall be entitled to provide notice thereof to Landlord. In the event Landlord has failed to substantially complete such repair and restoration within thirty (30) days thereafter (subject to Force Majeure and Tenant-caused delays), this Lease shall terminate and the parties shall be released from all further obligations under this Lease.

6

13.    **Condemnation**.  If any part of the improvements constituting a part of the Premises, all access to the Premises or parking spaces that are required for compliance with zoning should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a **"Taking"** or **"Taken"**), and the Taking would prevent or materially interfere with Tenant's use of the Premises or in Landlord's judgment would materially interfere with or impair its ownership of the Premises, then either party upon written notice to the other may terminate this Lease and Base Rent shall be apportioned as of said date.  If more than 30% of the Premises shall be Taken, and this Lease is not terminated as provided above, then Base Rent shall be abated on a reasonable basis as to that portion of the Premises rendered untenantable by the Taking. Otherwise, there shall be no abatement of Base Rent.  In the event of any such Taking, Landlord shall be entitled to receive the entire award, compensation or proceeds from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for moving expenses and damage to Tenant's Trade Fixtures.

14.    **Indemnification**.    Tenant will protect, indemnify and save harmless Landlord from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) imposed upon or incurred by or asserted against Landlord by reason of the occurrence or existence of any of the following during the Lease Term or thereafter (while Tenant is in possession of the Premises):  (a) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Premises or any common areas, or any part thereof or occurring on or about the adjoining sidewalks, curbs, loading docks, stairs, vaults and vault space, if any, streets or ways as a result of Tenant's actions, (b) any failure on the part of Tenant to perform or comply with any of the terms of this Lease, or (c) performance of any labor or services or the furnishing of any materials or other property, at the request of Tenant, its agents, employees or contractors. In case any action, suit or proceeding is brought against Landlord by reason of any such occurrence, Tenant, upon Landlord's request, and at Tenant's expense, shall resist and defend such action, suit or proceeding or cause the same to be resisted and defended by counsel designated by Tenant and reasonably approved by Landlord.  The obligations of Tenant under this Section shall survive any termination of this Lease.  The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this Section.

15.    **Maintenance of Premises.**

15.1.    Tenant's Responsibilities.  The Tenant, at its expense, shall keep and maintain the interior of the Premises in good order and repair and in compliance with all statutes, ordinances and governmental regulations.  In addition, the Tenant, at its expense, shall make all redecorations, repairs and replacements to the ceilings, floors, walls, doors, windows (including replacement of cracked or broken glass with like kind and quality), including, the heating, air conditioning, electrical and plumbing systems, except as otherwise set forth in this Section 15.  Tenant shall have the HVAC equipment serviced by a contractor at least quarterly and provide copies of the service reports to Landlord promptly after each such service.  Provided that Tenant performs the quarterly servicing of the HVAC system as required hereunder and performs all maintenance recommended

7

by the HVAC contractor, Landlord shall be responsible for the replacement and non-routine repair of the HVAC systems for amounts which exceed $500.00 per occurrence. Tenant shall remain responsible for all other repairs and routine maintenance of the HVAC system. If the Tenant shall fail to begin any maintenance or repairs required to be made by the Tenant within fifteen (15) days after written notice thereof by the Landlord or to complete such maintenance or repairs promptly thereafter, then the Landlord shall have the right to make such repairs or maintenance for the account of the Tenant and the cost thereof shall be added to and collected with the next monthly installment of the fixed minimum rental. If the Landlord shall fail to begin any maintenance or repairs required to be made by the Landlord within fifteen (15) days after written notice thereof by the Tenant or to complete such maintenance or repairs promptly thereafter, then the Tenant shall have the right to make such repairs or maintenance for the account of the Landlord and the reasonable and necessary cost thereof shall be reimbursed to Tenant within thirty (30) days after written demand therefor by Tenant. For purposes of this Section, any repairs, replacements or maintenance to the HVAC system that exceeds Five Hundred Dollars ($500.00) per occurrence shall be considered non-routine. On the Commencement Date, the Landlord shall deliver the HVAC system in good working order sufficient to provide heating, cooling and ventilation to the Premises in a matter consistent with the industry standard for similar industrial space in Vanderburgh County, Indiana. Any costs Landlord incurs in the delivery of the HVAC system shall not be included in additional charges to the Tenant in the form of Additional Rent. The Tenant shall also keep and maintain the lawn and landscaping in a manner exceeding, or at a minimum consistent with the balance of the Tenants in the Airport Industrial Park. The Tenant shall also keep and maintain the parking lot in the Premises and the sidewalks immediately adjoining the public entrance to the building on the Premises clean and free from snow, ice, dirt and rubbish to the reasonable satisfaction of the Landlord and the Tenant shall not place or permit any obstructions in such areas.

15.2.   Landlord's Responsibilities.  The Landlord, at its expense, shall maintain and repair all structural components of the building constructed on the Premises, which includes the exterior walls, interior structural supports, the roof, downspouts and foundation of the Premises.

16.   **Tenant Alterations and Trade Fixtures**.  Tenant may make alterations and improvements to the Premises that are not structural and will not diminish the value of the Premises at the expiration of the Lease Term in accordance with plans and specifications which have been previously submitted to and approved in writing by Landlord. Notwithstanding anything to the contrary, Landlord consents to: (i) interior, non-structural changes by Tenant not exceeding $100,000.00 in any twelve (12) month period; and (ii) cosmetic changes by Tenant without any limitation, subject to the other terms and conditions of this Lease. Any alterations or improvements made by or on behalf of Tenant to the Premises, ("**Tenant Alterations**") shall become part of the Premises. Tenant shall cause, at its expense, all Tenant Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant Alterations. All Tenant Alterations shall be made in accordance with all applicable laws, regulations and building codes, in a good and workmanlike manner and of quality equal to or better than the original construction of the Premises. Tenant, at its own cost and expense and without

8

Landlord's prior approval, may erect such shelves, bins, machinery and trade fixtures (collectively "**Trade Fixtures**") in the ordinary course of its business consistent with its Permitted Use provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Tenant, at its expense, shall remove its Trade Fixtures and shall immediately repair any damage caused by such removal, prior to the expiration or earlier termination of this Lease; provided, however, that in the event this Lease is terminated due to Tenant's default, any Trade Fixture or equipment purchased by Tenant with an allowance from Landlord shall remain the property of Landlord, except for any Trade Fixtures or equipment Landlord directs Tenant to remove. Notwithstanding anything in the foregoing, implied or expressed to the contrary, Landlord has not consented to any work that would permit the making of any claim against Landlord or the Premises in respect thereof. Landlord shall be entitled to post on or about the Premises notices of non-responsibility pursuant to all applicable laws, regulations and building codes. Notwithstanding anything to the contrary in this Section 16, the parties acknowledge that Tenant shall have the right to: (i) remove the paint booth located in the building on the Premises, and (ii) replace the air compressor serving the Premises (collectively, "**Tenant's Improvements**"). Once completed, Tenant's Improvements shall be considered Tenant Alterations.

17.    **Signs**. All exterior signs shall be subject to Landlord's reasonable approval and conform in all respects to Landlord's reasonable requirements and to all applicable covenants, restrictions and government regulations.

18.    **Assignment and Subletting**. Tenant shall not voluntarily, or by operation of law, sell, assign, transfer, convey, sublease or encumber this Lease or any right or interest thereunder without first obtaining, in each instance, the prior written consent of Landlord, which consent will not be unreasonably withheld; provided, however, that upon any such assignment or sublease, Tenant shall remain fully responsible for the performance of all of the terms, covenants and conditions of this Lease. A direct or indirect change of control of the ownership of Tenant shall constitute an assignment, which shall require Landlord's consent except for the transactions permitted in Section 18.2 of this Lease. Any sublessee or assignee of the Premises shall not have the right, in any event, to further assign this Lease or further sublet the Premises without the prior written consent of Landlord. In determining whether to grant consent to Tenant's sublet or assignment request, Landlord may consider any of the following factors, which will be reasonable grounds for deciding Tenant's request:

(a)    financial strength of the proposed subtenant/assignee must be at least equal to that of the existing Tenant;

(b)    business reputation of the proposed subtenant/assignee must be in accordance with generally acceptable commercial standards;

(c)    managerial and operational skills of the proposed subtenant/assignee must be at least equal to those of the existing Tenant;

9

(d)     use of the Premises by the proposed subtenant/assignee will not violate the law or create any negative reputation for Landlord; and

(e)     use of the Premises will not violate any other agreement affecting the Premises or Landlord.

18.2.   Permitted Transactions.   Notwithstanding any other provision of this Lease to any contrary, if any entity that directly or indirectly owns or controls the majority of ownership interest in Tenant ("**Parent**") either (i) sells, conveys or otherwise transfers substantially all of its assets to an another entity or (ii) merges with any other entity, Landlord's written consent as provided in Section 18.1 shall not be required in connection with any assignment of the Lease that may result from such merger, sale, conveyance or transfer, provided the acquiring entity agrees to be bound by all rights and obligation under this Lease.  Tenant shall also have the right to assign or sublet its rights and obligations under this lease to an affiliate that is owned or controlled by Parent without Landlord written consent as provided in Section 18.1, provided the Parent guarantees the payment of Rent and the completion of Tenant's obligations under this Lease.

19.     **Inspection and Access**.  Landlord and its agents, representatives and contractors may enter the Premises during normal business hours and with reasonable notice, to inspect the Premises and to make such repairs as may be required or permitted pursuant to this Lease and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective purchasers and, during the last year of the Lease Term, to prospective tenants.  Landlord may, during the last six (6) months of the Lease Term, erect a suitable sign on the Premises stating the Premises are available to let or for sale.  Landlord may grant easements, make public dedications, designate common areas and create restrictions on or about the Airport Industrial Park, provided that no such easement, dedication, designation or restriction materially interferes with Tenant's Permitted Use or occupancy of the Premises.  At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.

20.     **Surrender**.  Upon the expiration of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received; broom clean, ordinary wear and tear and casualty loss and condemnation covered by Sections 12 and 13 excepted.  Any Trade Fixtures, Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property.  All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, and obligations concerning the condition and repair of the Premises.

21.     **Holding Over**.  If Tenant retains possession of the Premises after the termination of the Lease Term, unless otherwise agreed in writing, such possession shall be a tenancy at will terminable upon either parties written notice and all of the other terms and provisions of this

10

Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to 150% of the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over. All other payments shall continue under the terms of this Lease. In addition, no holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided.

22.    **Events of Default**.  Each of the following events shall be an event of default ("**Event of Default**") by Tenant under this Lease:

(a)    If the Tenant shall (i) fail to pay an installment of the Rent when due and such default is not cured within five (5) days after written notice to Tenant that the same is due, provided that Landlord shall not be obligated to give Tenant notice of late payments more than two (2) times in any twelve (12) month period from the date such payment is due; or (ii) fail in the performance of any of the other terms, conditions or covenants of this Lease to be performed by the Tenant for more than thirty (30) days after written notice of such failure given by the Landlord to the Tenant, unless such failure is of such nature that it cannot be cured within such thirty (30) day period, in which case no Event of Default shall occur so long as Tenant shall commence the cure of such failure to perform within such thirty (30) day period and shall thereafter diligently prosecute the curing of the same.

(b)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (C) become the subject of any proceeding for relief which is not dismissed within ninety (90) days of its filing or entry; or (D) be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(c)    Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(d)    Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within forty-five (45) days after any such lien or encumbrance is filed against the Premises.

(e)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section, and except as otherwise expressly provided

11

therein, such default shall continue for more than thirty (30) days after Landlord shall have given Tenant written notice of such default.

23.    **Landlord's Remedies**.  Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may, subject to any judicial process and notice to the extent required by law, at any time thereafter at its election terminate this Lease or Tenant's right of possession (but Tenant shall remain liable as hereinafter provided), and/or pursue any other remedies at law or in equity.  Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to reenter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom.  If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises.

If Landlord terminates this Lease, Landlord may recover from Tenant the sum of: (i) all Base Rent, Additional Rent and all other amounts accrued hereunder to the date of such termination; (ii) the cost of reletting the whole or any part of the Premises, including without limitation, brokerage fees and/or leasing commissions incurred by Landlord, costs of removing and storing Tenant's or any other occupant's property, costs of repairing, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant or tenants; (iii) all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and (iv) the then present value of the Base Rent, Additional Rent and other amounts payable by Tenant under this Lease as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease, less any amounts obtained by Landlord as a result of mitigation, including reletting the Premises, pursuant to Legal Requirements.  Such present value shall be calculated at a discount rate equal to the 90-day U. S. Treasury bill rate at the date of such termination.

If Landlord terminates Tenant's right of possession (but not this Lease), Landlord may, but shall be under no obligation to, relet the Premises for the account of Tenant for such rent and upon such terms as shall be satisfactory to Landlord without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant.  For the purpose of such reletting Landlord is authorized to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable without notice to Tenant.  If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the Rent reserved in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including attorneys' fees and costs of suit), the unpaid Base Rent, Additional Rent and other amounts accrued hereunder at the time from time to time.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

Any law, usage, or custom to the contrary notwithstanding, Landlord and Tenant shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof.  The failure of any party at any time to enforce their rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same.  Tenant and Landlord further agree that forbearance or waiver by Landlord or Tenant to

enforce their rights pursuant to this Lease or at law, or in equity, shall not be a waiver of their right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. The terms "enter," "reenter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premise shall be on such terms and conditions as Landlord in its sole discretion may determine (including, without limitation, a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting. Notwithstanding the foregoing, Landlord shall use reasonable efforts to mitigate its damages in accordance with Legal Requirements.

24. **Limitation of Liability of Landlord**. If any default by Landlord under the terms of this Lease shall continue for thirty (30) days after written notice thereof from Tenant without Landlord's having commenced to cure said default and Landlord's exercising diligent efforts to complete the curing of same, Tenant may cure the same for the account of Landlord and the amount of any sums reasonably paid by Tenant for such purpose shall promptly be paid by Landlord to Tenant. Tenant shall have the right to bring an action in a court of competent jurisdiction against Landlord to recover any and all damages at law or equity that Tenant may suffer as a result of Landlord's default under this Lease, including any reasonable attorney's fees. All such obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter, provided that Landlord's successor assumes this Lease in writing. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership. IN NO EVENT SHALL EITHER PARTY BE ENTITLED TO CONSEQUENTIAL OR INCIDENTAL DAMAGES SHOULD EITHER PARTY BE FOUND LIABLE FOR AN UNCURED DEFAULT HEREUNDER.

25. **Waiver of Jury Trial**. TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LANDLORD AND TENANT ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

26. **Subordination**. Landlord shall have the right from time-to-time to create security interests in the form of a mortgage, deed of trust or other similar lien or encumbrance (a "**Mortgage**") upon or affecting Landlord's fee estate in the Premises, or any part thereof, and the rights of Tenant under this Lease shall be subject and subordinate to any such Mortgage; provided, however, that in the event of any foreclosure or sale under any such Mortgage or the delivery by Landlord of any deed in lieu of foreclosure to the holder of any such Mortgage, then the holder of any Mortgage or purchaser at foreclosure of the Mortgage must agree to not disturb

13

Tenant's possession so long as Tenant is not in default under the terms of this Lease beyond any notice and/or cure periods provided for herein in order for Tenant's interest in the Premises to be subordinate to the Mortgage.  Said subordination shall be self-operative if the holder of the Mortgage agrees to not disturb Tenant's possession and no further instrument of subordination shall be necessary unless required by any such Mortgage holder, in which event Tenant agrees to, within thirty (30) days after request by Landlord or the Mortgage holder, execute any agreement reasonably required by such Mortgage holder to memorialize said subordination and to memorialize the terms of any related agreements between Tenant and such Mortgage holder, including Tenant's right to non-disturbance. Any holder of any such Mortgage is herein referred to as "**Landlord's Mortgagee(s)**".

27.    **Mechanic's Liens**.  Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or the Premises or to charge the Rent payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs.  Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will indemnify and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Airport Industrial Park or the Premises or under this Lease.  Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Airport Industrial Park or the Premises and cause such lien or encumbrance to be discharged within thirty (30) days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 30 day period.

28.    **Estoppel Certificates**.  Tenant agrees, from time to time, within ten (10) business days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which Rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the expiration date of this Lease and such other matters pertaining to this Lease as may be reasonably requested by Landlord.  Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease.  No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate.

29.    **Environmental Requirements**.  Except for Hazardous Materials contained in products used by Tenant in de minimis quantities for ordinary cleaning purposes in compliance with Environmental Requirements (as hereinafter defined), Tenant shall not permit or cause any party to bring any Hazardous Materials upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent.  Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements, and shall remediate in a manner in accordance with Environmental Requirements any Hazardous Materials released on, under, to or from the Premises by Tenant, its agents, employees, contractors, subtenants or invitees.  Tenant

shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture, or release of Hazardous Materials on the Premises.  The term **"Environmental Requirements"** means all applicable past, present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource and Conservation Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term **"Hazardous Material(s)"** means and includes (i) any substance, material, waste, pollutant or contaminant listed or defined as hazardous or toxic under any Environmental Requirements; (ii) asbestos; (iii) petroleum, including crude oil or any fraction thereof; and (iv) natural gas or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting or produced therefrom.   In connection with such use of Hazardous Materials, Tenant shall comply with all Legal Requirements and shall be responsible for and indemnify Landlord with respect to all matters arising as a result of such use.  Tenant shall notify Landlord, in writing, of any new Hazardous Materials it intends to use on the Premises, which items shall be subject to Landlord's reasonable prior approval.

Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises and loss of rental income from the Premises), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation removal or management of any asbestos brought into the Premises or disturbed in breach of the requirements of this Section, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance.  The obligations of Tenant under this Section shall survive any termination of this Lease. Notwithstanding the foregoing, Tenant shall have no responsibility in connection with any pre-existing Hazardous Materials in the Premises.

Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Section, or the environmental condition of the Premises.  Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations.  Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests.  If at any time during or after the Lease Term, the Premises or Airport Industrial Park are found to be so contaminated or

subject to said conditions as a result of Tenant's breach of the terms of this Lease, Tenant shall diligently institute proper and thorough cleanup procedures at Tenant's sole cost. Before taking any action to comply with Environmental Requirements or to clean up Hazardous Materials contaminating the Premises, Tenant shall submit to Landlord a plan of action, including any and all plans and documents required by any Environmental Requirements to be submitted to a governmental authority (collectively a "plan of action"). Such plan of action must be implemented by a licensed environmental contractor.

30. **Force Majeure**. Neither party shall be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, unusual weather, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of such party ("**Force Majeure**"). The foregoing shall not apply to the obligation to pay Rent.

31. **Entire Agreement**. This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

32. **Severability**. Each provision contained in this Lease shall be construed to be separate and independent and the breach of any provision by Landlord shall not discharge or relieve Tenant from Tenant's obligation to observe and perform each of its obligations under this Lease. If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

33. **Quiet Enjoyment**. Tenant, if and so long as it pays the Rent and performs and observes the other terms and covenants as provided in this Lease, shall have the peaceable and quiet possession of the Premises during the Lease Term free of the claims of Landlord or anyone claiming by, through or under Landlord, subject to the terms of this Lease. This covenant shall be construed as a covenant running with the land and shall not be construed as a personal covenant or obligation of Landlord.

34. **Miscellaneous**.

(a) Any payments or charges due from Tenant to Landlord hereunder shall be considered Rent for all purposes of this Lease.

16

(b)    If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c)    All notices required or permitted to be given under this Lease shall be in writing and shall be sent by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to the parties at their addresses specified in the Basic Lease Term Section of this Lease. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery.

(d)    This Lease shall not be filed in any public record. Upon the request of either party, the parties shall execute and file a memorandum of lease, which shall not disclose any of the financial terms of this Lease.

(e)    Landlord and Tenant hereby acknowledge and agree that each party hereto (i) is of equal bargaining strength, (ii) has actively participated in the drafting, preparation and negotiation of this Lease, (iii) has consulted with such party's own independent counsel, and such other professional advisors as such party has deemed appropriate, relative to any and all matters contemplated under this Lease, and (iv) agree that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Lease or any exhibits or amendments hereto. This Lease shall not be more strictly enforced against either party regardless of who was more responsible for its preparation.

(f)    The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(g)    Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(h)    Construction and interpretation of this Lease shall be governed by the laws of the state in which the Premises are located, excluding any principles of conflicts of laws.

(i)    Time is of the essence as to the performance of Tenant's obligations under this Lease.

(j)    All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda and the terms of this Lease, such exhibits or addenda shall control.

17

(k)    Landlord represents and warrants that to the best of its knowledge, the Premises is zoned M-2.

(l)    Landlord represents and warrants that the Premises have vehicular access to publicly accessible right-of-way.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease as of the day and year first above written.

**TENANT:**                                    **LANDLORD:**

Goodman Networks, a Texas Corporation          Joseph L. Rexing Jr and Leo R. Rexing

By: _____                          By: Joseph L. Rexing
Printed: Bradley J. Fishel
Title: VP, Contracts                           By: _____
        May 2, 2017
Execution Date: _____                      Title: Owner
                                                    Joseph L. Rexing Owner

                                               Execution Date: 4·17-17

18

## REAFFIRMATION OF LANDLORD'S AGREEMENT

THIS REAFFIRMATION OF LANDLORD'S AGREEMENT (this "**Agreement**") dated as of May 3rd , 2017, is made by the undersigned ("**Landlord**") in favor of MIDCAP FUNDING X TRUST (successor-by-assignment from MidCap Financial Trust), as the agent (in such capacity, "**Agent**") for itself and the other financial institutions or other entities from time to time parties as lenders to the Credit Agreement referenced below (collectively, "**Lenders**").

A.      Goodman Networks Incorporated, a Texas corporation, Multiband Field Services, Incorporated, a Delaware corporation, and Goodman Networks Services, LLC, a Delaware limited liability company, (individually, each a "**Borrower**" and collectively, the "**Borrowers**"), Agent and Lenders were parties to that certain Credit and Security Agreement, dated as of July 29, 2016 (the "**Prior Credit Agreement**"), which has since been repaid in full.

B.      Borrowers, Agent and Lenders are parties to that certain Credit and Security Agreement, dated as of May 3rd, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), and to secure such financing, each of the Borrowers have granted to Agent a security interest in and lien upon certain of the tangible and intangible property of each of the Borrowers.

C.      Pursuant to and in accordance with the terms and conditions set forth in that certain Landlord's Agreement, dated as of September 26, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "**Landlord's Agreement**"), by and among Landlord, Agent and Goodman Networks Incorporated, Landlord, among other things, waived any liens Landlord may have in the Collateral of Goodman Networks Incorporated to the payment and performance of the liabilities and obligations of the Borrowers to Agent and Lenders under extensions of credit made by Agent and Lenders.

NOW, THEREFORE, in consideration of any financial accommodation extended by Agent and the Lenders to the Borrowers at any time, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Landlord acknowledges, reaffirms, ratifies and confirms its obligations under the Landlord's Agreement and all terms, provisions and conditions thereof, and agrees that the Landlord's Agreement shall continue in full force and effect and shall not be deemed terminated, altered or diminished by the payoff of the Prior Credit Agreement or the execution and delivery of the Credit Agreement and any related instruments and documents. Landlord confirms that the extension of credit pursuant to the Credit Agreement and any related instruments and documents are obligations of Borrowers to Agent and Lenders contemplated under the Landlord's Agreement.

2.      This Agreement shall be deemed to be made a part of the Landlord's Agreement and shall be governed by and construed and enforced in accordance with the laws of Maryland (without regard to the conflicts of law provisions thereof).

*(Remainder of page intentionally left blank)*

**IN WITNESS WHEREOF**, this Reaffirmation of Landlord`s Agreement has been executed and delivered by the undersigned as of the date first written above.

LANDLORD:

_____ (Seal)
Joseph L. Rexing, Jr.

_____ (Seal)
Leo R. Rexing